IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 2, 2020

# IN RE: JUSTIN D., ET AL.[1]

**Appeal from the Juvenile Court for Unicoi County**
**No. JV8653   David R. Shults, Judge**

_____

## No. E2019-00589-COA-R3-PT

_____


A mother and father's parental rights to two children were terminated on the grounds of abandonment, persistence of conditions, failure to manifest an ability and willingness to assume custody, and upon a determination that terminating the parents' rights would be in the best interest of the children. Each parent appeals; we reverse in part as to certain statutory grounds but affirm the termination of the parental rights of each parent.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in part and Affirmed in part**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which KENNY W. ARMSTRONG, J. joined.  D. MICHAEL SWINEY, C.J., filed a separate concurring and dissenting opinion.

Jessica McAfee, Greeneville, Tennessee, for the appellant, Megan Nicole R.

Ryann Musick Jeffers, Elizabethton, Tennessee, for the appellant, Justin Cleve D., Sr.

J. Matthew Bolton and Darcee L. Kubisiak, Johnson City, Tennessee, for the appellees, Breanna D. T. and Joshua H. T.

Sarah E. Larkin, Johnson City, Tennessee, Guardian ad Litem.

---

[1] This Court has a policy of protecting the identity of children by initializing the last names of the parties.

# OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

Megan R. ("Mother") and Justin D. ("Father") are the parents of Justin, born in September 2011, and Peyton, born in January 2015 (together, "the Children"). Mother's sister, Breana T. ("Aunt"), filed a petition in the Unicoi County Juvenile Court alleging that the Children were dependent and neglected and seeking custody of them on February 26, 2016. The petition alleged that Mother and Father were using methamphetamines, that one of the children was born drug-addicted and had ingested the contents of a pipe, and that Aunt feared for the Children's safety; the court granted her custody of the Children that day. At a hearing on March 30, the parents were granted supervised visitation, and at a hearing on May 4, the court found probable cause that the Children were dependent and neglected "based on absence of parent"; the case was referred to the Family Support Services division of the Department of Children's Services for therapeutic visitation. On August 17, an adjudicatory hearing was held, after which the court found that the children were dependent and neglected, and granted custody to Aunt and Joshua T. ("Uncle," together "the Petitioners"). Neither parent appeared for the hearing, and the court ordered that neither of the parents would be allowed to contact the Children until the parent appeared in court and demonstrated that the parent should have contact.

On February 16, 2017, Mother petitioned the court for visitation; she and Aunt attended mediation on March 8 and entered into a "Phase I" temporary parenting plan agreement on March 9, which allowed the parents to have supervised visitation if each of them agreed to a drug screen at the request of Petitioners or the court. Mother and Petitioner Aunt attended court-ordered mediation on May 3, and entered into a "Phase II" temporary parenting plan agreement that allowed Mother to have overnight visitation from Friday to Saturday, and two hours of visitation on Mondays and Tuesdays; the agreement enforced the drug screen requirement from the previous agreement in addition to requiring the parents to continue parenting classes. The court entered an order on August 9 setting Mother's support at $219 per month beginning on August 1, and setting a retroactive support obligation of $1,214, computed as of July 31. On September 27, the court entered an order requiring Mother to undergo mental health counseling, which could, at the discretion of the counselor, involve the Children; to not have any contact with the Children of any type, other than the counseling session; and to supply a nail bed drug test or a hair follicle drug test to the court clerk by November 1, 2017.[2]

---

[2] Aunt testified that the order precipitated from an event during one of Mother's unsupervised visits when Aunt tried unsuccessfully to reach the Children; that Mother told Aunt that she and Father had an argument, after which Mother departed, leaving the children with Father; and that Aunt later determined that the Children were at the home of Mother's neighbor, whom Aunt did not know.

Aunt filed a petition to terminate the parents' visitation rights on January 2, 2018, alleging that the Children were neglected during the unsupervised visits; that Mother had not complied with the order requiring the hair follicle or nail bed drug test; that Father attempted to force himself into Petitioners' home to see the Children; and that the oldest child had been having behavioral problems since the unsupervised visits had been terminated. The court entered an order on the same day, terminating the parents' visitation pending further orders from the court. On February 2, Mother petitioned the court for full custody of the Children, or in the alternative, to have her visitation rights reinstated.

On February 14, Petitioners filed a Petition for Termination of Parental Rights, alleging, as to both parents, abandonment by failure to visit, failure to manifest an ability and willingness to personally assume legal and physical custody of the children, substantial noncompliance with the "statement of responsibilities regarding the children in a court order," and persistence of conditions; in addition, as to Father, the petition alleged abandonment by failure to support. The petition also asserted that termination of parental rights was in the best interest of the Children, and that the court should allow Petitioners to adopt the Children. The court appointed a guardian ad litem and a Court-Appointed Special Advocate ("CASA") for the Children on February 21.[3]

Trial took place on August 29, October 16, and October 26, 2018. The court entered its final order on March 14, 2019, terminating both parents' rights on the grounds of abandonment by willful failure to visit, persistence of conditions, and failure to manifest an ability and willingness to assume legal and physical custody; the court also held that Father abandoned the Children by his willful failure to support.[4] Both parents appeal. Mother raises the following issues:

1. Whether the trial court erred in finding that Mother willfully abandoned the Children by failing to visit, when a no contact order was in place.

2. Whether the trial court erred in finding that persistent conditions existed at the time of trial which would warrant terminating Mother's parental rights.

---

[3] The CASA was relieved by order entered on November 9, 2018.

[4] Although the petition asserted that termination was warranted on the ground of "substantial noncompliance with the parenting plan," the statutory ground for termination is actually "substantial noncompliance . . . with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." Despite the involvement of the Department of Children's Services, the Children were never placed in foster care and thus no permanency plan was created, as would have been required by Tennessee Code Annotated section 37-2-403. Further, the court's ruling that this ground was not clearly and convincingly established by the evidence is not contested on appeal; accordingly, we do not address this ground in our analysis.

3

3. Whether the trial court erred in finding that Mother failed to make efforts to regain physical or legal custody and that to place the Children with her would cause detrimental harm to them.

4. Whether the trial court erred in finding it to be in the best interests of the Children for termination of Mother's rights to occur.

Father raises the same issues, with one additional:

1. Whether the trial court erred in finding that Father willfully abandoned the Children by failing to support.

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about

the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

### III. ANALYSIS

### A. Abandonment

At the time the petition was filed, "abandonment" as a ground for termination of parental rights was defined as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2016). The petition in this case was filed on February 14, 2018; consequently, the relevant four-month period is from October 13, 2017 to February 13, 2018.

The parents' arguments relative to this ground center on the element of willfulness; the court in *In re Audrey S.* explained this element as follows:

> . . . Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. . . .

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a

person's actions or conduct.

182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (internal citations omitted).[5]

*1. Father's Failure to Support*

The court made the following findings relative to the ground of Father's failure to support:

The proof showed that the Father paid a total of $335.96 for child support during the relevant four (4) month period.

1. Because the Petition For Termination Of Parental Rights was filed on February 14, 2018, and the Father was incarcerated for only 5 days during the 4 months immediately preceding the filing of the petition, the relevant time period with regard to the Father's support is October 14, 2017 through February 14, 2018.

2. The Father was ordered to pay support for his two minor children.

3. On January 30, 2018, an Order Withholding For Support was established, showing that the Father owed $338.00 per month for current support, and $40.00 per month toward his arrearage. The Order showed that the Father was working for Atwork Personnel Services.

4. On February 15, 2018, the Father appeared in child support court, where he stated that he had been working for a temp agency for several weeks and made several payments, such that his license previously suspended for nonpayment was reinstated.

---

[5] Petitioners bore the burden at trial of establishing by clear and convincing evidence that Father's failure to visit and support was willful. Tenn. Code Ann. § 35-1-113(c); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). As this Court recently noted in *In re Gabriel B.*:

The statute defining "abandonment" was amended effective July 1, 2018, and as amended, Tenn. Code Ann. § 36-1-102(1)(A) no longer includes the term "willful" in its definition of "abandonment." Instead, Pub. Ch. 875, § 2, codified at Tenn. Code Ann. § 36-1-102(1)(I), makes the absence of willfulness an affirmative defense to abandonment for failure to visit or support. The parent (or guardian) will have to prove by a preponderance of the evidence that the failure to visit or support was not willful. Because this change is substantive rather than procedural or remedial, however, the amended statute will not be applied retroactively to this case. *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004).

No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *4 n.7 (Tenn. Ct. App. July 23, 2018).

5. During the relevant time period, the Father paid a total of $335.96 toward the support of the children.

6. The Father testified that he had paid no support other than what had been withheld from his paychecks.

7. The Father testified that the reason he does not work currently is due to his addiction, and provided no other reasons for not working.

Wherefore, the Court FINDS that the Petitioners have proven by clear and convincing evidence that the Father has abandoned the children for his willful failure to support them.

Father does not dispute the court's factual findings; he acknowledges in his brief that he was aware of his duty to support and that at times he did not pay support.[6] He attributes his failure to work to his addiction, and argues that Petitioners did not show that he was able to provide support "outside of the time that he was employed and actually paying support," or establish that he "voluntarily and intentionally chose not to provide financial support without a justifiable excuse." On the record presented, we do not agree that his addiction is a justifiable excuse for his failure to pay support.

Father testified that, at various points in the four months preceding the filing of the petition, he was employed by a business known as Casa Nostra's, Walmart Distribution, and at a factory before he was incarcerated on January 4. The record from the dependency and neglect proceeding includes an income withholding order directing Atwork Personnel Services, Father's employer at the time, to withhold $378.00 per month for current child support and arrears. When asked at trial about his failure to pay support during the four-month period, he testified as follows:

Q. So during that period of September 2017 through January 2018, you were working, but you still didn't make any child support payments. Correct?

A. No, Ma'am. I could -- I wasn't in the position really even to take care of myself. I was trying to find a home, trying to support a home, and...

Q. Okay.

_____

[6] In his brief he states:

Father meets the first criteria, in that he was aware through Court hearings involving child support enforcement that he had a duty to support the children. Father did work for part of the relevant four-month period, and during his time of employment he did in fact pay support.

7

A. ...other things at the same time, too. I'm not going to sit here and say that I'm...

Q. And since the last court hearing in August, you haven't made any payments. Correct?

A. If that's what the papers say.

Q. Okay.

A. If that's what my records show.

Q. Okay.

A. According to my records. I don't know.

Q. Okay.

A. I know I tried to get a job. I was trying to get a job and keep it, but by the time the two weeks had come up and I was already getting ready to lose that job because of my addiction, that was when child support was just about to step in was the time. It's been like that for going on two years, and sorry that it's taken me this long to kind of notice that.

Father testified about his addiction in another context, as well:

Q. Okay. Another allegation is Paragraph 12 of the Petition, says you failed to show, either by your actions or failure to act, an ability and willingness to assume legal and physical custody or financial responsibility of the children. That could be child support or by having a safe and stable home.

A. Yes.

Q. Would you say that that's true?

A. Yes, it is. It is very true. It's hard to -- like I said, I couldn't -- I could get very good jobs, but I couldn't hold them because of the addiction.

The record shows, and Father's argument acknowledges, that he obtained multiple jobs during the four-month period and that he paid support when he was working; the excuse he gives for his failure to maintain employment was his addiction. The question of whether drug addiction constituted a justifiable excuse for failure to pay support was also presented in *In re Kira G*, in which a father testified that he had a drug addiction; that he quit his job and did not have a desire to work due to his addiction; and that he

spent what money he did make to support his addiction. No. E2016–01198–COA–R3–PT, 2017 WL 1395521 at *5–6 (Tenn. Ct. App. April 18, 2017). We affirmed the termination of that father's rights on the ground of abandonment by failure to support, holding that the father's decision to support his drug habit and not pay meaningful support was a choice that constituted willfulness within the meaning of the statute. *Id.*

The evidence shows that Father was able to secure "very good jobs," yet he failed to pay support; by his own admission, but for his addiction, he would have maintained his employment and been able to pay support. Being aware of his duty to pay support, and being able to maintain employment, Father chose to engage in behavior that led to the loss of his employment. Consistent with the holding in *In re Kira G.*, this constitutes willfulness within the meaning of section 36-1-102(1)(D), and we affirm the termination of Father's rights on this ground.

*2. Father's Failure to Visit*

The trial court made the following factual findings in holding that Father willfully failed to visit the Children:

> The proof showed that the Father engaged in none to only token visitation at best with the children. While it appeared that he visited as allowed in a mediated agreement from June until September of 2017, those visits were initially restricted due to his substance abuse problems. He never attempted to lift the restrictions of his visitation that he felt were placed at a later date, and he only attempted to visit the children on one occasion during the relevant time period.
>
> \*\*\*
>
> 2. The Father mediated an agreement with the Petitioners effective March 8, 2017, in which he was to enjoy progressively less strict visitation over time.
>
> 3. On September 27, 2017, the Mother was ordered to have no contact with the minor children until she complied with mental health counseling and a hair follicle or nail bed drug test. The Father testified that he believed he was under the same no contact order.
>
> 4. On Thanksgiving Day 2017, the Father called the Petitioners and asked to see the children, and although he was told that he could not do so because the Petitioners were having their Thanksgiving dinner, the Father showed up at their house on the afternoon of the holiday and demanded to see the children. The Petitioners called the police and the Father left the Petitioners' residence.

9

5. The Father testified that he made no other attempts to see the children, that he did not file a petition with regard to his visitation, and that he did not attempt to obtain a copy of the order that he believed restricted his visitation

Wherefore, the Court FINDS that the Petitioners have proven by clear and convincing evidence that the Father has abandoned the children for his willful failure to visit them during the relevant 4 month period.

Father does not dispute that he failed to visit the Children; he contends that his failure to visit was not willful because he believed that a court order suspended his visitation. Father's argument is premised on an order that was entered on September 27, 2017, that prohibited Mother from having any contact with the Children other than as set out in the order. The terms of the order and the circumstances surrounding its entry, however, do not support Father's argument.

The record in the dependent and neglect proceeding shows that Father and Mother were granted supervised visitation on March 9, 2017, when the court entered the "Phase I" mediated settlement agreement; the case was reset for hearing on May 3. The "Phase II" mediated settlement agreement, entered on May 4, granted unsupervised visitation to Mother and ordered both Mother and Father to continue parenting classes and provide drug screens to the court; although a follow-up hearing for July 26 was scheduled in the order, there is nothing in the record to indicate that the hearing was held on that day. There is, however, an order entered September 27, following a hearing on September 26, stating that there would be "no contact, of any type, between mother and the children, other than as set forth above."[7] Father's visitation was not terminated until January 2, 2018, when Aunt filed a petition to terminate both parents' visitation, asserting, among other things, that Father attempted to visit the Children by forcing himself into Petitioners' home on Thanksgiving after he was told that he could not exercise visitation on that day and not to come to their home; the order terminating his visitation pending further orders was entered that day.

The record shows that Father was granted and exercised visitation prior to the September 27 order, and that he was not prohibited in exercising visitation until January 2, 2018. Aunt testified that Father and Mother exercised their visitation as allowed under the mediated agreements; and that the parents "made it to third phase all the way up until the day before [they] went to court."[8] Even after his unsuccessful attempt to visit the Children on Thanksgiving, which he testified took place after he became aware that his

---

[7] See Footnote 2, *supra.*

[8] Taken in context, it is apparent that Aunt's reference to "the day before [they] went to court" was September 26.

visitation was not suspended, Father testified that he did not make any effort to call or visit the Children or petition the court for visitation.

Father does not dispute the court's factual findings, and, upon our review, we conclude that the findings are supported by the testimony in the record. Father conceded that he did not visit the Children during the relevant period, and only attempted to visit them once on Thanksgiving. Father's excuse for his failure to visit the Children prior to the entry of the January 2, 2018 order terminating his visitation, is unavailing. We conclude that the testimony clearly and convincingly demonstrates that Father's failure to visit was willful and thus affirm the termination of Father's rights on this ground.

### 3. Mother's Failure to Visit

In terminating Mother's parental rights on this ground, the court held:

The proof showed that during the entire relevant time period, the Mother's visitation was restricted due to her need to obtain mental health counseling and provide a clean nail bed or hair follicle drug screen. The Mother neither obtained the requisite counseling nor submitted to a hair follicle or nail bed drug test.
***
2. Because the Petition For Termination Of Parental Rights (hereinafter, "the Petition") was filed on February 14, 2018, and there was no relevant incarceration during this time period, the relevant time period with regard to the Mother's visitation is October 14, 2017 through February 14, 2018.
3. The Mother testified that she had not taken the nail bed or hair follicle drug test because she was not able to afford it.
4. The Mother testified that she had attended some counseling sessions, but provided no testimony or other proof that a counselor had recommended that visitation between her and her minor children resume.
5. During the relevant time period, the Mother had no contact of any kind with the children.

Wherefore, the Court FINDS that the Petitioners have proven by clear and convincing evidence that as a result of the Mother's choice to continue her substance abuse, rather than address it so that she could lift the restrictions on her visitation, the Mother has abandoned the children for her willful failure to visit them during the relevant 4 month period.

Mother does not dispute that she did not visit the Children during the relevant period; she contends that her failure to visit was not willful because her visitation had been suspended by the court. On the record presented, this argument is without merit.

The order entered on September 27, 2017, suspending her visitation provided that:

[T]he Mother shall undergo counseling at Erwin Mental Health which shall, in the discretion of the counselor, involve the children; no contact, of any type, between Mother and the children, other than as set forth above; Mother shall supply a nail bed drug test or a hair follicle drug test, by November 1, 2017, to the court clerk; and case closed[.] (Mother to refile when she cleans up her life[.])

In her brief on appeal, with respect to the drug screens, Mother submits that "when [she] was ordered . . . to take either a nail bed or a hair follicle screen, it became impossible due to her not having the funds at the time. She was literally unable to pay for that particular testing, but could have easily complied with urine screens." The testimony and exhibit cited in support of this contention, however, relates to urine drug screen results taken in July and August of 2018. In testimony relating to the requirement in the September 27 order, Mother stated:

Q.     And we're going to go ahead and go back through some things and some questions that were not asked earlier. Go ahead and tell the Court when was the last time you had visitation with your children, Justin and Peyton.

A.     In August of 2017.

* * *

Q.     And after you had that last visitation, what were you told by this Court as to future visitation?

A.      That I would have -- that I would have to go to therapy with Erwin Mental and submit to a hair follicle test by November the 1st of 2017.

Q.     And did you comply with those?

A.      I went to the therapy, but I did not go to the hair follicle screening. I did not have the money, and I misunderstood the Court Order because on the actual Court Order it says by November the 1st report to the county clerk. I didn't really understand that that meant that I had to submit the drug screen to the county clerk. I came up here on November the 1st, and they said, "Ms. R[.], you're supposed to have this turned in by November the 1st." So I kinda misunderstood.

Q.     And did you at the time were you actively (inaudible)?

12

A.    Yes.

Q.    And was your drug use affecting your judgment on those matters?

A.    Yes.

Q.    Was your drug use impairing you from complying with the Court's Orders?

A.    Yes. I just -- you could say that.

Contrary to Mother's argument that she could have complied with urine drug screens, there is no evidence that, during the four months preceding the filing of the petition, she took any drug test or drug screen, or sought relief from the order, and she did not produce any evidence of her sobriety during that time.

In *In re Roger T.*, the trial court terminated the mother's parental rights on the ground of abandonment by willful failure to visit, among others. On appeal, the mother contended that her failure to visit was not willful because her visitation had been suspended by the trial court. *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). In addressing this argument, this court noted that the mother's visitation was suspended because she failed to produce negative drug screens, and held that a "parent's choice to continue to use drugs when the parent is prohibited from visiting a child until passage of a drug test constitutes a willful failure to visit the child." *Id.* (quoting *In re Morgan S.,* No. E2009–00318–COA–R3–PT, 2010 WL 520972, at *9 (Tenn. Ct. App. Feb. 12, 2010)).

With respect to the counseling she was ordered to attend in the September 27 order, Mother argues that she attended counseling "but because she never provided a letter to the Court with recommendations to start therapeutic visitation, the Court found Mother did not comply with the court's directive." This explanation is not supported by the testimony, which was as follows:

Q.    What else were you supposed to do?

A.    Counseling, which I did at Nolachuckey Behavioral Health along with Watauga. I started out at Watauga, and then when I moved to Greeneville during those four months. From October to August the 17th I moved to Greeneville and moved into a trailer, was trying to get everything together for the boys and everything, and during that time I was doing my therapy sessions with Nolachuckey down there.

Q.    And why did they end?

A.    Because I moved. I moved back. I got evicted from that house.

13

Q.     Was there an order or letter releasing you from counseling?

A.     No ma'am.

Q.     You just moved and…

A.     I moved and by the time I get back up here in Johnson City and got into an appointment, I had already went back to jail.

To the extent that Mother contends that her failure to exercise visitation was due to the requirements of the September 27 order, Mother's testimony establishes that she was the author of her fate, and that her failure to comply with the order was solely due to her own actions or inactions. Consistent with the holding in *In re Roger T.*, we conclude that Mother's testimony that she could not afford the drug screen and that her drug use prevented her from complying with the court's order is not a justifiable excuse for her failure to visit. Similarly, her failure to continue in counseling was, by her own testimony, prompted by voluntary and intentional decisions she made to move on several occasions and not seek counseling in the new locations.

We conclude that the determination that Mother willfully failed to visit the Children is supported by clear and convincing evidence.

## B. Persistence of Conditions

At the time the petition in this case was filed, the statute addressing the ground commonly referred to as "persistence of conditions" stated:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3) (2017).[9] Each of the statutory elements must be established by clear and convincing evidence. *In re Michael B.*, No. M2019-01486-COA-R3-PT, 2020 WL 2988932, at \*10 (Tenn. Ct. App. June 4, 2020) (citing *In re Valentine*, 79 S.W.3d 539, 550 (Tenn. 2002)).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at \*7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at \*6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at \*9 (Tenn. Ct. App. Mar. 3, 2008)).

The Children were removed from their parents' custody as a result of the Aunt filing a petition for custody on February 26, 2016; the court entered an order that day giving Aunt custody of the Children due to their status as dependent and neglected. On March 2, 2016, the court entered an order continuing custody of the Children with Aunt, and resetting the hearing for March 30. At the March 30 hearing, Mother and Father appeared and requested time to hire counsel; the court entered an order continuing custody with Aunt, granting the parents supervised visitation, and resetting the case for April 6. The record next contains an order entered May 4, reciting that the parents did not appear and, on the basis of Aunt's sworn petition holding there was "probable cause based on [the] absence of [the] parent"; the court granted Aunt custody of the Children, and set a review hearing for July 13.[10] The next order in the record was entered August 17, again reciting that Mother and Father did not appear, and finding that the Children were dependent and neglected; and the court awarded Aunt and Uncle custody of the Children and ordered that neither Father nor Mother have any contact with the Children until appearing in court. The finding that the Children were dependent and neglected led

---

[9] This ground has since been substantively amended; *see* 2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856).

[10] The record does not show whether the April 6 hearing was reset for May 4 or whether the order memorializing the April 6 hearing was not entered until May 4.

to their removal from the parents' home, thus satisfying the threshold determination under section 36-1-113(g); we proceed to examine the evidence in support of the ground, considering each parent separately.

*1. Mother*

In the order finding that the ground was established as to Mother, the court held:

The proof showed that the Mother has obtained a home, has obtained employment and has paid her child support continually due to a withholding from her social security income. However, she has failed a drug screen as recently as February of 2018 and has appeared untruthful with regard to her continued involvement with the Father, whose substance abuse problem is unquestioned. The Mother does not attend any ongoing substance abuse programs, including stopping her attendance at Narcotics Anonymous. The Mother only recently began her mental health treatment, arguably as late as October 16, 2018. While the Mother appears to have made some progress, it does not appear that she has done enough as of this time. While it is understood that re-establishing stability is difficult and takes time, the Mother's progress has been slow and mostly recent. At this time any continued upheaval in the children's lives would be detrimental to their integration into their intended adoptive home.

1. The Juvenile Court of Unicoi County adjudicated the children dependent and neglected on August 17, 2016.

2. The children have been removed from Mother's home since that date.

3. On August 16, 2016, Wendy Honeycutt, DCS Family Support Services case manager, filed a report to the Court. The report indicated that in the recent past the Mother had obtained multiple criminal charges, including drug possession charges. The report also provided that the Mother was homeless, staying at different places, still needed alcohol and drug treatment and was not engaging in visitation with the children.

4. The Petitioner, Ms. T[.], testified that the Mother told her that she had been abusing drugs the entire time during the mediated unsupervised visitation period.

5. The Mother testified that she had last abused substances in 2018, once testifying that she had last used in February 2018, once testifying that she last used prior to her incarceration on March 28, 2018 and once testifying that she has been clean and sober only since she got saved in May of 2018.

6. The Mother testified that as of February of 2018, she was looking into inpatient rehabilitation programs, however she failed to attend any inpatient program.

7. The Mother testified that she attended Narcotics Anonymous programs regularly, but then testified on cross examination that she had gone less than regularly due to her work schedule. The Mother testified that as of October 22, 2018, she was no longer attending Narcotics Anonymous because she did not have the time.

8. The Mother testified that she had obtained three clean urine screen results, but they were not until July 25, 2018, July 30, 2018 and August 7, 2018.

9. As of the third day of trial on October 22, 2018, the Mother had still not obtained a hair follicle or nail bed drug screen and testified that as of October 22, 2018, she was able to afford the drug screens, but had not yet obtained one upon the advice of counsel.

10. As of October 22, 2018, the Mother had obtained and maintained a home since June. When she testified on August 29, 2018 she had very little to no furniture in the home. When she testified on October 22, 2018 she had obtained sufficient furnishings due to funds and furnishings provided to her by the Father and other friends.

11. As of October 22, 2018, the Mother had not yet obtained her driver's license, but had saved some money towards that goal.

12. As of October 22, 2018, the Mother had obtained full time employment.

13. As of October 22, 2018, the Mother was attending therapy for approximately forty-five (45) minutes to one (1) hour every two (2) weeks, which she began after the last court date. It was unclear if the Mother meant the October 16, 2018 court date, or the August 29, 2018 court date.

14. As of October 22, 2018, the Mother testified that she had allowed the Father to stay with her, testifying once that it was 1 or 2 times, then 3 or 4 times.

Mother does not dispute the court's factual findings; she argues, in her brief, that she "has made substantial progress in her sobriety and proved her stability, through the pendency of the trial," and "[t]herefore, [she] does not have insufficient income, unstable housing, or drug issues that remain unresolved." In this regard, she also asserts that the court did not specify the particular conditions which persisted at the time of trial.

17

With respect to her sobriety, Mother cited to her testimony on cross-examination, which stated:

Q.   Erwin Mental Health just started in July or August of this year. Correct?

A.   Yes, Ma'am.

Q.   Because you missed the first appointment, and so you were on the waiting list?

A.   Yes, Ma'am.

Q.   So are you still going?

A.   Yes, Ma'am. I've been and got a letter from my therapist.

Q.   So at most you've been going there for three months?

A.   Yes, Ma'am. At Erwin Mental Health, but I went to Watauga Behavioral Health for a while, and I went to Nolachuckey Mental Health for a while, too, but because my residency wasn't ever stable enough, I never continued with therapy more than three or four sessions at a time.

Although not explicitly stated in the testimony above, Mother's prior testimony explained that she was attending individual drug and alcohol therapy at Erwin Mental Health every two weeks for forty-five minutes to an hour. The testimony demonstrates that Mother had taken steps to address her substance abuse issues through therapy. Moreover, although not cited by Mother in support of her argument, the evidence shows that she provided the court with negative drug screen results for July and August 2018, as proof of her sobriety.

With respect to housing, Mother cited to her testimony that she secured housing and the exhibit that contained a copy of her lease agreement. As evidence of her income, Mother cited to her testimony that she worked forty hours a week at $8.00 per hour; and that she receives two disability checks in the amount of $412 and $115 each month.

Upon our review, we conclude that the evidence is consistent with the court's findings. Mother's testimony supports, and she does not contest, the finding that she had not completed mental health counseling; that she had not, as of trial, obtained a hair follicle or nail bed drug screen; that she chose not to participate in an inpatient rehabilitation program during the relevant period; and that she allowed Father to stay with her. The evidence demonstrated that Mother had provided the court with negative drug screens to prove that she had been sober for at least two months as of the trial, obtained housing, and secured and maintained employment. Upon our review, we

conclude that the condition that led to the removal of the Children, which was the parents' substance abuse issues, had been remedied by Mother. We, next, proceed to determine whether the evidence established that "other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect" persisted.

While Mother's failure to distance herself from Father, who testified that he continued to struggle with substance abuse, failure to enroll in an inpatient rehabilitation facility, and failure to complete counseling may be characterized as "other conditions" that could likely cause harm to the Children, we conclude that these conditions no longer persist. Regarding counseling, Mother's testimony that she, as of trial, had been attending individual therapy at Erwin Mental Health showed that she was taking steps to complete counseling. With respect to Mother's relationship with Father, Aunt's testimony that Father relocated to Texas prior to the last day of trial may also be viewed as a remedy to Mother's previous failure to distance herself from him since he has, effectively, removed himself. Lastly, although there is no evidence that Mother had enrolled in an inpatient rehab, she had several clean drug screens and was participating in drug therapy; in light of this evidence of her sobriety, the evidence is not clear and convincing that this condition could not be remedied in the near future or that her failure to enroll would likely subject the Children to further harm.

We conclude that the evidence shows that Mother had resolved or was taking steps to address the conditions related to her sobriety and lifestyle that had previously caused the Children to be subjected to neglect. Petitioners did not satisfy their burden of proving, by clear and convincing evidence, that the condition that led to the Children's removal, or other conditions that would prevent the Children's safe return to Mother, persisted. The court's determination that any "continued upheaval in the Children's lives would be detrimental to their integration," on its own, does not establish this ground when there is no evidence that the conditions that led to the Children's removal, or would cause them to be subjected to harm or neglect, persisted. Therefore, we reverse the court's determination with respect to Mother.

### 2. Father

When asked whether the conditions that led to the removal of the Children persisted, which were stated to be drug exposure, lack of housing, and inadequate income, Father responded, " . . .right now, yes, it would be right," and testified that the conditions related to his lack of housing persisted; that it would take at least six months for him to achieve sobriety; and that, as of the trial, he was not able to take care of the Children, did not have adequate income, and did not have transportation aside from a bus ticket to Texas, where he intended to relocate.

Father's testimony demonstrates that the conditions that led to the removal of the Children persisted, and that there is little likelihood that Father would have remedied

19

these conditions at an early date so that the Children could safely return to him in the near future. The court did not make a specific finding as to the third factor under this ground: whether the continuation of the parent and child relationship would greatly diminish the Children's chances of early integration into Petitioners' home. However, Father conceded that he had not seen the Children since November 2017; that he intended to relocate to Texas; and that it would take at least six additional months for him to resolve his substance abuse issues. Upon our review, we conclude that Father's testimony, which demonstrates that he has not achieved stability or sobriety, is clear and convincing evidence that continuing Father's relationship with the Children would diminish the Children's chances of early integration into a safe, stable, and permanent home. Having determined that the three elements required to establish this ground are supported by clear and convincing evidence. we affirm the court's determination.

## C. Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) provides:

A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires the Petitioners to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, Petitioners must prove that Mother failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the Children. Tenn. Code Ann. § 36-1-113(g)(14). Then, they must prove that placing the Children in Mother's or Father's custody would pose a risk of substantial harm to their physical or psychological welfare. *Id.*

There is a split of authority regarding the proof required to establish the first prong of the analysis. In *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), a panel of this Court held that a party seeking to terminate a parent's rights must prove by clear and convincing evidence that the parents failed to manifest both an ability and a willingness to personally assume legal and physical custody of the child or that they failed to manifest an ability and a willingness to personally assume financial responsibility for the child.[11] When evaluating ability, we

---

[11] Other panels of this court have followed the decision in *In re Amynn K.,* No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12-15 (Tenn. Ct. App. June 20, 2018), and concluded that a party is not required to prove a failure to manifest both a willingness and an ability to assume responsibility of the child.

focus "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020) (citing *In re Ayden S.*, 2018 WL 2447044, at *7). "When evaluating willingness, we look for more than mere words." *Id.* Rather, a parent must have demonstrated willingness "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.*

Considering the second element of this ground, this Court has observed the following regarding the requirement of "substantial harm":

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

With respect to this ground, the court held:

The proof showed that the Father has no desire to have custody of the children.

1. The Father testified on October 16, 2018 that he does not wish to assume custody of the children, and that it would be approximately six (6) months before he could establish sobriety.

2. The Father continues to have substance abuse issues and is homeless.

3. The Father did not appear for the 3rd day of trial on October 22, 2018.

4. The Father moved to Texas on or about October 17, 2018 with no plan to return to Tennessee.

Father does not make any argument with respect to this ground, and he does not dispute any of the court's findings or its holding. On October 16, Father testified that he "wanted to find [his] redemption in some rehabilitation," and that he "wanted [Mother] to keep her chances of getting custody . . .and would like to pay child support towards her and stay away" until he was rehabilitated ; that he intended to move to Texas where he has family support and a job; that he was unable to take care of the Children at that time; that he did not have housing or income; and that he had substance abuse issues at the time

of trial that would take at least six months to resolve. Moreover, Father conceded at trial that he was unable or unwilling to assume custody of the Children. Father's testimony demonstrates his lifestyle and circumstances rendered him unable to assume custody in the near future. There is no evidence of any attempt by Father to overcome the obstacles that prevent him from assuming custody of the Children. Although the court did not state as much, we conclude that Father's continued struggle with substance abuse is sufficient evidence that placing the Children in his custody would pose a risk of substantial harm to the welfare of the Children. Therefore, we conclude that the court's determination is supported by clear and convincing evidence.

With respect to Mother, the court restated factual findings five through fourteen from the ground of persistence of conditions, and held:

The proof showed that the Mother has not demonstrated her willingness to assume custody of the children. While the Mother made some progress as to housing and income, her sobriety was only very recently established, and her continued success in her sobriety is questionable given her failure to maintain any sort of substance abuse support even as of the date of trial. Additionally, the Mother's continued involvement with the Father appears to be a refusal to distance herself from the Father.

***

Wherefore, the Court FINDS that the Petitioners have proven by clear and convincing evidence that the Mother has demonstrated an unwillingness to assume custody of the minor children.

Mother argues that this ground was not proven by clear and convincing evidence because Petitioners failed to prove that she was unable or unwilling to assume custody of the Children. Mother contends that the trial court erred when it determined that she failed to maintain substance abuse support and that the evidence preponderates against the court's finding that she failed to distance herself from Father, and that she took two years to "start working on achieving sobriety, finding suitable housing, and starting to rebuild a separate life from Father and for herself and the Children."

As explained under the discussion of the previous ground of persistence of conditions, the court's findings are supported by the evidence. The testimony and exhibits show that Mother had maintained employment, obtained housing, began to participate in counseling, and began saving money to have her license reinstated. Mother had not, as of trial, complied with the court's mandate that she obtain a hair follicle or nail bed drug screen; however, the record contained negative drug screen results as evidence of Mother's sobriety for the months of July and August 2018. Aunt testified that, as of the

last day of trial, Father had relocated to Texas, and there was no evidence that he intended to return to Tennessee.

Based on the aforementioned evidence, we conclude that Mother, having provided negative drug screens, secured employment and housing, and taken steps to have her license reinstated, demonstrated that she was willing to assume custody, as she has attempted to overcome the obstacles that would prevent her from assuming custody. Although, the evidence supports the court's determination that Mother failed to maintain ongoing substance abuse support, the court was to consider whether she made attempts to overcome the obstacles; her participation in counseling and the drug screen results that demonstrate her sobriety are sufficient to establish that she was attempting to overcome her substance abuse issues and complete counseling.

Petitioners have not cited to any evidence to demonstrate that Mother had not attempted to overcome the obstacles that would prevent her from assuming custody of the Children, and upon our review of the record, we find none.

With respect to the consideration of whether Mother was able to assume custody, the court did not make a separate determination of this element, and Petitioners have not cited any evidence that Mother's lifestyle and circumstances, as of trial, rendered her unable to assume responsibility of the Children. In light of the evidence discussed above, we conclude that the evidence does not support a determination that Mother was unable to assume custody.

Petitioners have not directed this court to any evidence that having the Children in Mother's custody would pose a risk of substantial harm, nor does the court make such a finding in its order. Although Mother failed to comply with the court-ordered drug screen and failed to distance herself from Father prior to his relocation, the evidence does not clearly and convincingly demonstrate that placing the Children with Mother would expose them to a risk of substantial harm.

Finding that the evidence is not clear and convincing that Mother was unable and unwilling to assume custody, or that her having custody would pose a risk of substantial harm to the Children, we reverse the court's holding in this regard.

Having concluded that clear and convincing evidence existed as to at least one statutory ground for each parent, we turn to the best interest determination.

### D. Best Interest

We review the court's conclusion that termination of Father's and Mother's parental rights are in the best interest of the Children under the clear and convincing evidence standard. The legislature has set out a list of factors at Tennessee Code

Annotated section 36-1-113(i)[12] for courts to follow in determining a child's best interest. The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

The Tennessee Supreme Court recently explained:

Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they

---

[12] Section 36-1-113(i) provides:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.,* 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child...." Tenn. Code Ann. § 36–1–101(d) (2017).

*In re Gabriella D.*, 531 S.W.3d 662, 681–82 (Tenn. 2017).

The trial court made the following findings with respect to statutory factors (1), (3), (4), (5), (7), and (9):

(1)     Neither parent has made such an adjustment of circumstances that the children could be safely returned to the custody of either of them.

        The Father testified that he cannot take custody of the children, that he still has substance abuse issues, that he is homeless, and that he does not have a job. The Father testified that he intended to move to Texas to work and find support to establish sobriety.

        While the Mother has established a home, employment, and seems to have recently established sobriety, it does not appear that she has established sufficient sobriety such that the children could safely be returned to her home. By her own testimony, it is possible that the Mother was abusing substances as recently as May of 2018, many months after the filing of the termination petition. The Mother is not engaged in ongoing substance abuse support, such that as the matter progressed through multiple trial dates she even suspended her involvement with Narcotics Anonymous. The Mother continues to maintain a relationship with the Father, despite his unwillingness to establish sobriety in his life.

\*\*\*

(3)     Neither parent has maintained regular visitation with the minor children. While the Father testified that he felt he was under the same no contact order as was the Mother, he made no attempts to obtain that Order or otherwise to attempt to have his visitation restrictions lifted. By his own testimony, his one attempt to visit with his children was ill advised at best.

        While it is true that the Mother had a no contact order in place in late 2017, she took no steps to have that Order lifted, despite that the steps she

25

needed to take were clearly spelled out in the Order. The Mother contended that she did not have the money to obtain a hair follicle or nail bed test, however she provided no explanation for why she could not address her mental health issues sufficiently to allow for visitation with her minor children.

\*\*\*

(4)     No meaningful relationship has been established between the parents and the minor children. The Father testified that he did not have any kind of relationship with the younger child. As for both parents, however, it is undisputed that the children have been in the custody of the Petitioners for most of their young lives. The Father and the Mother's issues have been ongoing for approximately three to four (3-4) years, with their visitation being suspended during much of that time.

\*\*\*

(5)     A change of caretakers and physical environment at this time would have a detrimental emotional and psychological effect on the minor children, as they are in an established and stable home and all of their needs are being met. The children have been in the care of the Petitioners for three to four (3-4) years. Both Petitioners are gainfully employed, have always maintained employment, and [Aunt] is obtaining further certification that will lead to a pay increase. The Petitioners have never been arrested and have never taken illegal drugs. [Aunt] has maintained HUGS services for the children during their stay in her home. While there was testimony that the Petitioners' current home is currently going through probate, [Aunt] testified that she and her husband have never been homeless.

\*\*\*

(7)     The Father's physical environment and abuse of substances would render him unable to care for the minor children. The Father testified that he is currently homeless and that his substance abuse issues remain unaddressed.

\*\*\*

(9)     The parents have not consistently paid child support. The Father has only worked intermittently, and has paid child support only after being ordered and by way of a wage assignment. The Mother has paid child support more consistently, and pays through an assignment of her social security income. However, despite receiving her social security income the

26

entire time her children have been removed from her custody, the Mother did not begin paying support until ordered to do so by the Court.

Father, again, adopts Mother's arguments with respect to the best interest determination by reference, and asserts that it is not in the best interest of the Children to have one parent, despite him only being able to provide financial and emotional support to Mother until the court "deems him appropriate" to regain custody.

With respect to factor (1), Mother contends that the evidence preponderates against the court's determination because she had achieved and maintained sobriety, found housing, and maintained employment.

Father's testimony shows that he, as of the trial, had not been able to maintain employment, was homeless, and still struggled with substance abuse. Father informed the court of his intent to move to Texas so that he could obtain employment and establish sobriety, and, prior to the last day of trial, he had relocated. Father did not put forth any evidence that would preponderate against the court's findings, and, upon our review, we conclude that the findings are supported by his testimony.

In support of Mother's argument, she relied on her testimony that she enrolled in individual drug therapy in August 2018 and was still attending that counseling as of October 2018; and that she last abused substances in February 2018. This testimony does not preponderate against the court's findings. Along with Mother's testimony that she last abused substances in February 2018, she also testified, at the August trial date, that she had only been sober since May 2018. With respect to substance abuse support, Mother testified that the last time she had been to an NA meeting was early August; that she had "probably" been to a total of four NA meetings in 2018 and two since she was released from jail in May; that, as of the October 16 trial date, she no longer attended NA because she did not have time; and that she began attending individual drug and alcohol therapy once every two weeks "right after the last court date." Concerning her relationship with Father, Mother testified that, since she obtained housing on June 29, she allowed him to stay with her "probably about three or four" times.

In light of the testimony, we conclude that the court's findings are supported by the evidence. Although Mother contends that her testimony shows that she began participating in drug and alcohol therapy and that the last time she abused substances was in February, there is also testimony that shows that she quit attending NA, after only attending approximately four meetings, and that she may have abused substances as recently as May 2018. Furthermore, Mother conceded that she allowed Father to stay with her multiple times; Aunt's testimony that Father relocated does not contradict the court's finding that Mother failed to distance herself from him prior to his departure. The court acknowledged, and Mother does not dispute, that she obtained housing, employment, and recently established sobriety; these findings are supported by the

exhibits in the record. Therefore, Mother failed to establish that the evidence preponderates against the court's determination.

With respect to factor (3), neither parent disputes that they did not visit the Children. Mother contends that her testimony that she had attended counseling preponderates against the court's findings.

Father testified that he was under the impression that his visitation was suspended under the court's no-contact order; he later discovered that the order did not apply to him, and attempted to visit the Children on Thanksgiving. The circumstances of his visit, however, led to Petitioners calling the police to remove Father from their property. Following that incident, Father testified that he did not attempt to call or visit the Children, nor did he make any effort to inquire with the court about his ability to visit or have his visitation restrictions lifted.

Mother's visitation, however, was suspended in September 2017; the order restricting her visitation provided that if she obtained a hair follicle or nail bed drug screen and participated in mental health counseling, which could have involved the Children, at the discretion of the counselor, she could exercise visitation. Mother acknowledged that she did not comply with the drug screen requirement because she was unable to afford it; however, even when she was able to afford it, she chose not to have the drug screen. As for the mental health counseling requirement, Mother testified that she attended counseling, but stated that she had never completed more than three or four sessions at a time due to her instability. This testimony supports the court's determination that Mother failed to sufficiently address her mental health issues; Mother's testimony that she began participating in a counseling program in August 2018 does not preponderate against this finding because Mother had not completed any mental health counseling that would have allowed her to exercise some form of visitation during the relevant period. Thus, we conclude that the court's findings, with respect to Mother and Father's visitation, are supported by a preponderance of the evidence.

With respect to factor (4), Mother contends that Aunt's testimony that the oldest son, Justin, was excited when he thought he would be returning to the parents in 2017, and began having behavioral issues after Aunt told him otherwise, demonstrates that there was a meaningful relationship. We disagree.

The initial petition for custody shows that the Children were placed in Petitioners' custody on February 26, 2016; the Children were approximately four and one years of age. The Children had lived in Petitioners' home for about two and a half years, as of the first trial date; the parents' visitation was suspended for much of that time. Mother testified that she had not visited or talked to the Children since August 2017; Father testified that he had not attempted to visit the Children since November 2017. Thus, the parents had not seen or spoken with the Children for almost one year as of the first trial

28

date. While Aunt's testimony evidences a meaningful relationship between Mother and Justin around August 2017, it is not sufficient evidence of the current state of Mother's relationship with Justin; Mother did not cite to any evidence of her relationship with Peyton. We conclude that the court's findings in this regard are supported by a preponderance of the evidence.

With respect to factor (5), Mother argues that there was no evidence that justified the court's finding that a change of caretakers would likely cause emotional or psychological harm to the Children; she asserts that the court failed to "recognize the Children's bond with their Mother and how they might feel by not being able to see [her] anymore." We disagree.

As stated above, the Children have been in the care of Petitioners for over two years; as of October 16, Aunt testified that the Children were ages seven and three. When discussing this factor, Aunt testified that a change of caretakers would negatively affect the Children; she explained her belief further when she testified:

Q. Thank you. Anything else that you think is important that Judge Shults should know?
A. The psychological effects of the child being bounced from home to home is detrimental in itself. When you watch a parent be an addict and you know that they act different from different moms and dads, it has an effect on you. When my sister and Mr. D[.] made it to the third phase, little Justin, who is the older boy, was so excited. He was so excited that his mommy and daddy were doing good, and he was so excited that they were going to go back home. And they made it all the way to the very end phase, and they fooled everybody until she come to court and you drug tested here in court, and she had been using the whole time. So then I had to go home and tell a six-year old little boy that, "You don't get to go back to your mommy and daddy because your daddy didn't show up for court, and even though your mommy did, she had stuff in her system that wasn't supposed to be there." And I had to deal with a six-year old screaming and crying and not understanding why, "Last week I was getting to go with my mommy and daddy, but this week I can't." It ripped his heart out, and he...
Q. Go ahead.
A. He started having behaviors at school. He quit eating, which is what he was doing when I very first got them, and he reverted back into hisself. He wouldn't talk with my other kids. He wouldn't play. He started having behaviors at school to the point to where he has to see the school counselor twice a week now because he has just some overloads and meltdowns. I'm not trying to put him through that again.

When asked about she and her husband, Aunt testified that she and Uncle have

always maintained employment, never been arrested, never been homeless, and never taken illegal drugs. Aunt testified that the Children call Petitioners "mom and dad" and that the Children get along with Petitioners' biological children. The CASA, Jennifer Davies, testified that, during her visit at Petitioners' home, the Children were happy, "at home," and had everything they needed.

In accordance with the consideration required for factor (5), the court determined that Petitioners' home was established and stable and that they were meeting the needs of the Children. Aunt's testimony supports the determination that a change of caretakers would likely have a negative effect on the Children and that the Children are established in Petitioners' home. The court's determination is further supported by Ms. Davies' observation of the Children in Petitioners' home. Mother has not cited to any evidence that would preponderate against the court's findings. Upon our review, we conclude that the court's findings are supported by a preponderance of the evidence.

With respect to factor (7), the court held that Father's physical environment and abuse of substances rendered him unable to care for the Children. Father does not dispute this finding on appeal, and the court did not find this factor to be applicable to Mother. Father testified that he was homeless, unable to maintain employment, and continued to have substance abuse issues. Father conceded that he was unable to care for the Children; and that he intended to move to Texas, where it would take him at least six months to establish sobriety. We conclude that the court's findings in this regard are supported by a preponderance of the evidence.

With respect to factor (9), Mother contends that this factor calls for the court to consider whether the parent has paid child support consistent with the child support guidelines, and that there is no evidence that she did not pay child support after she was ordered to. Mother's argument is consistent with the court's finding; however, her argument fails to acknowledge that she had a duty to support prior to the court's order.

Mother testified that she paid child support through assignment of her social security income, which she had been receiving the entire time since the Children were removed from her custody in February 2016. Mother was ordered to make payments in August 2017, and testified that she did not make any payments prior to that order. Father testified that he had been unable to maintain employment, but, when he was employed, he made child support payments by way of wage assignment. Father acknowledged that he failed to make payments per the guidelines during the relevant four-month period. We conclude that the court's findings in this regard are supported by a preponderance of the evidence.

In viewing the evidence from the perspective of the Children, we conclude that the Children are settled in their current home. The Children have been in Petitioners' care since 2016, and have not seen or been contacted by either parent since the fall of 2017.

Father admitted that he was unable to care for the Children, that he continued to have substance abuse issues, and that he intended to relocate to Texas; Mother had only recently taken sufficient steps to establish her sobriety and obtain employment and stable housing. Mother still had not completed any inpatient rehabilitation program or sufficiently completed any mental health counseling. In viewing the evidence in support of each factor, collectively, we conclude that the evidence clearly and convincingly supports the court's decision that termination was in the best interests of the Children.

## IV. CONCLUSION

For the foregoing reasons, we affirm the holdings that the evidence clearly and convincingly establishes the following grounds for termination as to Father: abandonment by willful failure to visit and support, persistence of conditions, and failure to manifest an ability and willingness to assume custody. As to Mother, we affirm the holding that she abandoned the Children by her willful failure to visit the Children but reverse the holdings that clear and convincing evidence existed to establish the grounds of persistence of conditions and failure to manifest an ability and willingness to assume custody. We affirm the holding that termination of Mother and Father's parental rights are in the children's best interest. Accordingly, we affirm the judgment terminating Mother and Father's parental rights.

RICHARD H. DINKINS, JUDGE

31